Filed 12/11/25  P. v. Rosas CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>RALPH DOMINIC ROSAS,<br><br>        Defendant and Appellant. | B337322<br><br>(Los Angeles County<br>Super. Ct. No. XNVPA062569) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Walgren, Judge. Affirmed.

Verna Wefald and Steven A. Brody, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Ralph Dominic Rosas appeals the trial court's denial of his Penal Code[1] section 1172.6 petition for resentencing on the ground he was ineligible for relief as a matter of law. We perceive no error, and we affirm.

## FACTUAL BACKGROUND

Christopher Rosas, Ralph's brother, co-owned Mugsy's Bar in Los Angeles with his best friend, Louis Campanelli.[2] The bar opened in November 2005, and Ralph was there every day. Campanelli lived on the premises. Ralph became angry when Campanelli refused his offer to purchase Campanelli's ownership share in the bar. In the months after Mugsy's opened, Christopher communicated to two witnesses that he wanted Campanelli killed.

The bartender working at Mugsy's on February 25, 2006, heard Christopher tell Ralph " 'tonight was the night,' " and Ralph later explained to her they planned to kill Campanelli. Around 1:45 a.m. on February 26, Christopher instructed the bartender to close early. While she put money from the cash register into the back office, Christopher and Ralph started

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     As Ralph Dominic Rosas shares the same surname as his brother and former codefendant, Christopher Rosas, we refer to them both by their first names for clarity and intend no disrespect.

This factual summary is provided for context and is drawn from our prior opinion affirming Ralph's conviction (*People v. Rosas* (Oct. 23, 2013, B233478) [nonpub. opn.]) (*Rosas I*)). (See *People v. Delgadillo* (2022) 14 Cal.5th 216, 222, fn. 2.) However, "our consideration of whether [Ralph] is entitled to [resentencing] relief . . . is based on our independent review of the record of conviction." (*Ibid.*)

2

" 'ripping apart the ATM machine,' " broke lights in the bar, and threw things around in the back office to make it look like it had been ransacked. They wore extra clothing and gloves and obscured their faces. Ralph told the bartender they planned to kill Campanelli when he returned with his girlfriend, Jennifer H.,[3] and Christopher told the bartender to watch the surveillance monitor to alert them to Campanelli's arrival.

When Campanelli and Jennifer returned around 2:30 a.m., Christopher and Ralph attacked them and beat them with pool cues. Campanelli begged for them to stop, but they continued to beat him, and Jennifer heard a "fire hydrant being sprayed" and "stabbing sounds."

The bartender was in the back office during the attack; she heard Jennifer scream, heard Campanelli say " 'you were supposed to be my best friend,' " and heard him " 'plead[] for his life gurgling through his blood.' " When the bartender was brought out from the back office about 20 minutes later, she saw Campanelli's still body on the floor; Christopher shoved a fire extinguisher hose down his throat and turned it on. Christopher, Ralph, and the bartender left.

Christopher later returned to take Jennifer's cell phone and car keys, but she was able to escape and flag down a passing motorist to call the police.

Police recovered evidence incriminating Ralph from the scene and later obtained incriminating statements he made to others after the crime.

The medical examiner testified at trial Campanelli died from "blunt cranial facial trauma or trauma to the head and face"

---

[3]  We refer to the surviving victim by her first name and last initial. (See Cal. Rules of Court, rule 8.90(b)(4).)

and "multiple sharp force injuries were contributing factors to his death."

## PROCEDURAL HISTORY

Christopher and Ralph were charged in a two-count indictment on May 8, 2009. Count 1 charged each with the murder of Campanelli and included two special circumstances allegations of lying in wait and personal use of a deadly and dangerous weapon. (See §§ 187, subd. (a), 190.2, subd. (a)(15), 12022, subd. (b)(1).) Count 2 charged them with assault with a deadly weapon upon Jennifer. (See § 245, subd. (a)(1).)

## I.    Relevant Jury Instructions

Ralph's jury received a number of instructions to guide their deliberations and decision making, including those described below.[4]

### A.    Aiding and Abetting

The jury was instructed with a modified version of CALJIC No. 3.00[5] that principals in the commission of a crime include "1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission of the crime." For the crime of murder in particular, "the aider and abettor's guilt is determined by the combined acts of all the participants as well as that person[']s own mental state." (See *ibid.*) As to aiding and abetting, the jury was informed "[a] person aids and abets the commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator,

---

[4]    Ralph and Christopher were both tried in the same trial but with separate juries.

[5]    Unless otherwise indicated, citations to the CALJIC instructions are to the versions in effect at the time of Ralph's trial.

4

and [¶] (2) With the intent or purpose of facilitating the commission of the crime, and [¶] (3) By act or advice, aids, promotes, encourages or instigates the commission of the crime." (See CALJIC No. 3.01.)

### B. Murder

As to murder, the jury was given the CALJIC No. 8.10 instruction defining murder, informing them "[d]efendants are accused in Count one of having committed the crime of murder, a violation of section 187 of the Penal Code. [¶] Every person who unlawfully kills a human being is guilty of the crime of murder . . . . [¶] A killing is unlawful, if it was neither not justifiable nor excusable. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A human being was killed; [¶] 2. The killing was unlawful; and [¶] 3. The killing was done with malice aforethought." (See *ibid.*) Malice was further defined as being "express or implied," and the jury was told "[m]alice is express when there is manifested an intention unlawfully to kill a human being." (See CALJIC No. 8.11.) And "[w]hen it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought." (See *ibid.*) Implied malice was not defined.

The jury was further informed "[a]ll murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree." (See CALJIC No. 8.20.) "To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill." (See *ibid.*)

Moreover, a "[m]urder which is immediately preceded by lying in wait is murder of the first degree." (See CALJIC No. 8.25; see also § 189, subd. (a).) " '[L]ying in wait' [means] waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise[.] The lying in wait need not continue for any particular period of time provided that its duration be substantial, that is, an amount of time that shows the killer had a state of mind equivalent to premeditation or deliberation." (See CALJIC No. 8.25.)

By contrast, "[m]urder of the second degree is also the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation." (See CALJIC No. 8.30.)

### C. Lying-in-wait Special Circumstance

The jury was also instructed regarding the special circumstance of lying in wait. (See §§ 190.2, subd. (a)(15), 190.4, subd. (a).) Among other things, the jury was told if it determined Ralph "was not the actual killer" and instead was "an aider and abettor," it could not "find the special circumstance to be true as to [Ralph] unless [it was] satisfied beyond a reasonable doubt that [Ralph] with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree." (See CALJIC No. 8.80.1.)

## II. Ralph's Conviction

In April 2011, Ralph was convicted of first degree murder and assault with a deadly weapon. The jury also found both special circumstances allegations to be true. In that regard, the

6

jury expressly found Ralph "intentionally killed [Campanelli] by means of lying in wait."

Ralph was sentenced to life without the possibility of parole on count 1, one consecutive year for the weapons use allegation, and one consecutive year on count 2. The judgment was affirmed by this court in *Rosas I, supra,* B233478.

### III.    Ralph's Resentencing Petition

On November 28, 2023, Ralph filed a section 1172.6 resentencing petition on a preprinted checkbox form and requested appointment of counsel. The trial court appointed counsel to represent him and ordered the People to respond. The People argued Ralph was ineligible for relief as a matter of law because he "was not convicted under a felony murder theory or a natural and probable consequences theory . . . and . . . could still be presently convicted" of murder despite the changes made to sections 188 and 189. They maintained no instructions were given on those abrogated theories, and Ralph was instead prosecuted and convicted as "a direct perpetrator and direct aider and abettor who acted with express malice." The response brief filed by Ralph's counsel made no additional arguments on his behalf.

On March 19, 2024, the trial court denied Ralph's petition because he failed to make a prima facie showing he was entitled to relief. Ralph timely appealed. (See (§ 1237, subd. (b); Cal. Rules of Court, rule 8.308(a).)

DISCUSSION

### I.    General Principles of Section 1172.6 Resentencing Relief

Section 1172.6, subdivision (a), allows criminals "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is

7

imputed to a person based solely on that person's participation in a crime" to file a resentencing petition in certain circumstances. (*Ibid*.) "[T]he section 1172.6 petitioning 'process begins with the filing of a petition containing a declaration that all requirements for eligibility are met ([§ 1172.6], subd. (b)(1)(A)), including that "[t]he petitioner could not presently be convicted of murder . . . because of changes to Section 188 or 189." ' " (*People v. Antonelli* (2025) 17 Cal.5th 719, 724 (*Antonelli*); see also § 1172.6, subd. (a)(3).)

The changes to sections 188 and 189 "altered the substantive law of murder in two areas": they "narrowed the application of the felony-murder rule" and "imposed a new requirement that 'a principal in a crime shall act with malice aforethought.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 448–449 (*Curiel*); see also §§ 188, subd. (a)(3), 189, subd. (e).) That latter change had the effect of "eliminat[ing] liability for murder as an aider and abettor under the natural and probable consequences doctrine." (*Curiel*, at p. 449.) Nevertheless, it "[did] not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*People v. Gentile* (2020) 10 Cal.5th 830, 848 (*Gentile*), abrogated on other grounds by § 1172.6, subd. (g); see also *Curiel*, at p. 462 ["Murder liability requires a . . . valid theory, such as direct aiding and abetting."].)

When a petitioner files a facially adequate section 1172.6 petition, the trial court "afford[s] the parties an opportunity to submit briefing [and] 'hold[s] a hearing to determine whether the petitioner has made a prima facie case for relief.' " (*Antonelli, supra*, 17 Cal.5th at p. 724.) To evaluate the petitioner's showing, " ' " 'the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the

8

petitioner would be entitled to relief if [those] allegations were proved.' " ' " (*Curiel*, *supra*, 15 Cal.5th at p. 460.) If the court concludes the petitioner has made a prima facie showing, it issues an order to show cause, but " '[i]f the petition and the record . . . establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition.' " (*Antonelli*, at p. 724.)

In evaluating the record in cases involving "individuals convicted following jury trials, the jury instructions [are] critical" to determining whether the petition has potential merit at the prima facie stage. (*Antonelli*, *supra*, 17 Cal.5th at p. 731.) Likewise, the jury's factual findings in the underlying criminal trial are "generally preclusive." (*Curiel*, *supra*, 15 Cal.5th at p. 453.)

## II. The Trial Court Did Not Err in Denying Ralph's Petition

Ralph's appeal turns on whether this record conclusively established his ineligibility for resentencing relief as a matter of law: that is, if it showed he was necessarily convicted of murder based upon a currently valid theory of liability. (See *Curiel*, *supra*, 15 Cal.5th at p. 462.) If Ralph were convicted under a theory of murder that remains valid, then he is ineligible for relief, and the petition was properly dismissed. (See § 1172.6, subd. (a)(3).)

At the hearing on the petition, the trial court explained "[i]t [was] abundantly clear . . . there were no instructions on natural and probable consequences. There were no instructions on felony murder. There was no prosecution theory relying on any theory of imputed liability." On the contrary, "[Ralph] was prosecuted as a direct perpetrator and a direct aider and abettor with the requisite intent in the commission of these crimes." Thus, the

9

court determined Ralph was ineligible for section 1172.6 relief as a matter of law.

Ralph acknowledges the jury was not instructed on the theories of felony murder or natural and probable consequences, but he argues the trial court nevertheless erred in denying his petition because his "jury was instructed on aiding and abetting," and thus, "he could have been convicted based on a theory under which malice was imputed to him based on his participation in the crime."[6] We disagree.

### A. Standard of Review

We review de novo a trial court's denial of a section 1172.6 petition at the prima facie stage. (*People v. Hickman* (2025) 110 Cal.App.5th 1262, 1268.)

### B. The Record Conclusively Establishes Ralph's Ineligibility for Relief

First, it is undisputed Ralph was not prosecuted for felony murder or murder under the natural and probable consequences theory, and no jury instructions were given on those theories. Thus, the changes wrought by the Legislature to the natural and probable consequences doctrine and the felony-murder rule are irrelevant here. (See *People v. Estrada* (2022) 77 Cal.App.5th 941, 946 (*Estrada*) ["the changes in Senate Bill No. 1437 to the natural and probable consequences doctrine do not apply to those

---

[6]    Ralph has not argued any other elements of the offense, under a valid direct aiding and abetting theory, were absent. (Cf. *Curiel, supra,* 15 Cal.5th at pp. 462–463 [a petitioner "puts at issue all elements of the offense under a valid theory"].) We therefore assume those were satisfied and do not discuss them further. (See *Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250, 1282 ["An appellate court 'will not develop the appellants' arguments for them.' "].)

who act with malice in aiding and abetting"]; *Gentile, supra,* 10 Cal.5th at p. 848 [changes to felony-murder rule were not applicable when the jury was not instructed on felony murder].)

Second, we acknowledge the jury instructions that were given allowed the jury to find Ralph guilty of first degree murder as an aider and abettor. But they also required his guilt for that crime be based on his own mental state. And the instructions told the jury that murder "perpetrated by any kind of willful, deliberate and premediated killing with express malice aforethought is murder of the first degree," and that it had to find Ralph had "the intent or purpose of committing or encouraging or facilitating the commission of the crime" of murder. On this record and in light of all the instructions given, " 'the jury would only find [Ralph] guilty of first degree murder, even as an aider and abettor, if it concluded he acted willfully and with intent to kill.' " (*Estrada, supra,* 77 Cal.App.5th at p. 945; see also *People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1263 (*Maldonado*) ["Direct aiding and abetting an implied malice murder remains a valid theory . . . ."].)

Moreover, this jury ultimately convicted Ralph of first degree murder and expressly found he intentionally killed Campanelli by means of lying in wait. (See §§ 187, subd. (a), 190.2, subd. (a)(15).) The jury's intent to kill finding is entitled to preclusive effect. (*Curiel, supra,* 15 Cal.5th at p. 460.) Where, as here, justification and excuse are not at issue, "[a]n intent to kill is the equivalent of express malice." (*People v. Coley* (2022) 77 Cal.App.5th 539, 547 (*Coley*).) The jury plainly determined Ralph personally acted with an intent to kill and thus, personally acted with express malice. There is thus no possibility the jury convicted Ralph under a now-invalidated theory of murder by imputing malice to him. (Cf. *Curiel,* at pp. 462–463 [a petitioner

11

convicted under the now-invalid natural and probable consequences theory may be eligible for relief, notwithstanding jury finding he acted with intent to kill].)

The record of conviction conclusively shows Ralph is ineligible for resentencing relief as a matter of law.

### C.     Ralph's Contrary Arguments Are Unpersuasive

Ralph argues *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*), and *Maldonado*, *supra*, 87 Cal.App.5th 1257, demonstrate the jury may have imputed malice to him as an aider and abettor. Those cases are inapposite and do not convince us the trial court erred in denying his petition.

*Langi* concerned a petitioner's "liability for second degree murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime." (*Langi, supra,* 73 Cal.App.5th at p. 978.) The court concluded the standard aiding-and-abetting instructions in use at the time of the petitioner's trial were "ill suited to the crime of second degree murder" because CALJIC No. 3.01 "create[d] an ambiguity under which the jury may find the defendant guilty of aiding and abetting a second degree murder without finding that he personally acted with malice." (*Langi,* at p. 978.) Another instruction was needed to "explain[] that, to be guilty as a direct aider and abettor of second degree murder, an accomplice must have acted with the mental state of implied malice." (*Id.* at p. 983.) Because no such instruction was given to the jury in that case, it was possible "the jury found [petitioner] guilty of second degree murder by imputing to him the implied malice of the actual killer, without finding that he personally acted 'with knowledge of the danger to, and with conscious disregard for, human life.'" (*Id.* at p. 984.)

12

*Langi* is not applicable here. As an initial matter, we doubt its reasoning regarding an ambiguity in CALJIC No. 3.01 has the same force in a case–like this one–where the jury convicted the petitioner of first degree lying-in-wait murder and expressly rejected second degree murder. But more importantly, the instructions given to Ralph's jury were crucially different from those at issue in *Langi*. The court in *Langi* explained that after that petitioner's trial, former CALJIC No. 3.00 was changed to provide, " '[T]he aider and abettor's guilt is determined by the combined acts of all the participants as well as that person's own mental state.' " (*Langi*, *supra*, 73 Cal.App.5th at p. 983, fn. 13.) The court suggested that new language could rectify the ambiguity it had identified in CALJIC No. 3.01. (See *Langi,* at p. 983 ["nothing in the [former version of the] aiding-and-abetting instruction[s] . . . states that the accomplice himself must have acted with such knowledge and conscious disregard"].) But the jury in Ralph's trial was given the 2010 revised CALJIC No. 3.00 instruction. (See CALJIC No. 3.00.) Thus, Ralph's jury was told he had to personally act with malice to be guilty of murder as an aider and abettor. And this jury expressly found Ralph "intentionally killed the victim," which is the equivalent of express malice. (*Coley*, *supra*, 77 Cal.App.5th at p. 547.) Thus, *Langi* does not help Ralph show he made a prima facie case for section 1172.6 relief.

Nor does *Maldonado* support Ralph's position. The court in *Maldonado* applied the reasoning of *Langi* to a first degree murder conviction because "first degree lying-in-wait murder can be based on a theory that the perpetrator acted with implied malice rather than an intent to kill." (*Maldonado*, *supra*, 87 Cal.App.5th at p. 1267.) We need not parse *Maldonado*'s reasoning in detail because there, "[t]he jury convicted [the

13

defendant] of first degree murder, but found the lying-in-wait special circumstance not true." (*Id.* at p. 1260.) Thus, that jury "did not necessarily find [the defendant] intended to kill the victim." (*Id.* at p. 1262, fn. 3.)

By contrast, it is undisputed Ralph's jury found the lying-in-wait special circumstance to be true. That is, his jury necessarily determined he acted with an intent to kill. (See *People v. Johnson* (2016) 62 Cal.4th 600, 630 ["A lying-in-wait special circumstance can apply to a defendant who, intending that the victim would be killed, aids and abets an intentional murder committed by means of lying in wait."].) Thus, this is not a case like *Maldonado* where the jury failed to find the petitioner harbored an intent to kill.

Ralph concedes his "jury was instructed that the lying in wait special circumstance required an intent to kill," but he argues he can nevertheless make out a prima facie case for relief according to the reasoning of *Curiel*. In that case, the Supreme Court explained a jury's finding of intent to kill "is only one element" of the crime of murder and "does not by itself establish any valid theory of liability." (*Curiel, supra,* 15 Cal.5th at p. 463.) Where a petitioner had been "convicted under an invalid theory like the natural and probable consequences doctrine," the jury's finding he harbored an intent to kill did not necessarily show he was ineligible for resentencing relief as a matter of law. (*Ibid.*)

But we have already explained Ralph's jury was not instructed on any now-invalid theory of murder. Rather, Ralph was prosecuted under a direct aiding and abetting theory, which remains valid. (See *Curiel*, *supra*, 15 Cal.5th at p. 463; *Estrada*, *supra*, 77 Cal.App.5th at p. 946.) That, combined with the jury's express finding Ralph acted with the intent to kill Campanelli, is

14

fatal to Ralph's efforts to make out a prima facie case for section 1172.6 relief.

## DISPOSITION

The order is affirmed.


RICHARDSON, J.

WE CONCUR:


CHAVEZ, Acting P. J.


SIGGINS, J.*

---

\*      Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.